**FEDERAL LABOR RELATIONS AUTHORITY, Petitioner,**

v.

**U.S. DEPARTMENT OF the TREASURY, FINANCIAL MANAGEMENT SERVICE, Respondent,**

**National Treasury Employees Union, National Labor Relations Board Union, Intervenors.**

No. 87–1107.

Nos. 87–1108, 87–1115, 87–1121, 87–1129 and 87–1319.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 7, 1988.

Decided Sept. 12, 1989.

As Amended Sept. 13, 1989.

---

William E. Persina, Deputy Sol., Federal Labor Relations Authority ("FLRA"), with whom Ruth E. Peters, Sol., and Pamela P. Johnson, Washington, D.C., FLRA, were on the brief, for petitioner in Nos. 87–1107, 87–1115 & 87–1121, and respondent in Nos. 87–1108, 87–1129 & 87–1319.

Al J. Daniel, Jr., Dept. of Justice, with whom Richard K. Willard, and John R. Bolton, Asst. Attys. Gen., and Leonard Schaitman, Washington, D.C., Dept. of Justice, were on the brief, for respondents in Nos. 87–1107, 87–1115 & 87–1121, and petitioners in Nos. 87–1108, 87–1129 & 87–1319. Jay B. Stephens, U.S. Atty., and Sandra Wien Simon, Washington, D.C., Dept. of Justice also entered appearances.

Elaine D. Kaplan, with whom Lois G. Williams and Gregory O'Duden, Washington, D.C., were on the brief, for intervenor National Treasury Employees Union in Nos. 87–1107 & 87–1129.

Joseph F. Henderson, with whom Mark D. Roth, Washington, D.C., was on the brief, for intervenor American Federation of Gov't Employees, AFL–CIO in Nos. 87–1115 & 87–1319.

Lewis S. Harris entered an appearance for intervenor N.L.R.B. Union in Nos. 87–1107 & 87–1108.

Before RUTH BADER GINSBURG, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge WILLIAMS.

Concurring Opinion filed by Circuit Judge RUTH BADER GINSBURG.

Concurring Opinion filed by Circuit Judge SENTELLE.

STEPHEN F. WILLIAMS, Circuit Judge:

In the four decisions under review, *Department of the Treasury, Financial Management Service*, 25 FLRA 560 (1987); *Department of Health and Human Services, Social Security Administration, Baltimore, Md. and Social Security Administration, Great Lakes Program Service Center, Chicago, Illinois*, 25 FLRA 828 (1987); *Department of the Navy, Portsmouth Naval Shipyard, Portsmouth, New Hampshire*, 24 FLRA 209 (1986); *National Labor Relations Board, Office of the General Counsel and the Board*, 24 FLRA 917 (1986), the Federal Labor Relations Authority ordered government agencies to comply with union requests for the names and home addresses of agency employees working in the relevant bargaining units. The unions stated that they needed the information to perform their representational duties effec-tively and that they were therefore entitled to it by 5 U.S.C. § 7114(b)(4) (1982). This requires agencies

> to furnish to the exclusive representative involved, or its authorized representative, upon request and, to the extent not prohibited by law, data ... (B) which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining.

Relying on its decision in *Farmers Home Administration Finance Office, St. Louis, Missouri*, 23 FLRA 788 (1986), *aff'd in substantial part and remanded sub nom. Department of Agriculture v. FLRA*, 836 F.2d 1139 (8th Cir.1988), *vacated and remanded*, — U.S. ——, 109 S.Ct. 831, 102 L.Ed.2d 964 (1989), the Authority held that agencies commit unfair labor practices when they refuse to supply authorized unions with employees' names and home addresses.[1]

Each of the agencies appealed to this court, where the cases were consolidated. They argue first that the information is not "necessary for ... discussion, understanding, and negotiation of subjects within the scope of collective bargaining," and second that disclosure is "prohibited by law," specifically by the Privacy Act, 5 U.S.C. § 552a. We agree with all the other circuits that have addressed the first issue that, under the deference the Authority is due on such matters, its interpretation of § 7114(b)(4) is permissible. Nevertheless, we must set aside the Authority's decisions; we are persuaded that release of the information is prohibited by the Privacy Act. Reviewing this issue de novo, we find that the Authority erred when it determined that disclosure fell within either the Act's exception for disclosures required by the Freedom of Information Act, 5 U.S.C. § 552(b)(2), or the exception for disclosures made in accordance with a "routine use," 5 U.S.C. § 552a(b)(3). Thus we grant the agencies' petitions for review and deny the FLRA's applications for enforcement.

---

1. In a ruling on an issue peculiar to the NLRB case, the Authority held that a union proposal to require annual disclosure of the data was negotiable and ordered the agency to bargain over the proposal upon request by the union. This holding was justified solely by the analysis articulated in *Farmers Home Administration.* See *NLRB,* 24 FLRA at 920.

## I. DISCLOSURE "NECESSARY" FOR THE COLLECTIVE BARGAINING PROCESS

To the extent that the FLRA is interpreting its own enabling statute, we cannot upset its "reasonable and defensible construction[ ]." *Bureau of Alcohol, Tobacco and Firearms v. FLRA,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (FLRA intended by Congress to use "specialized expertise" to "give content to the principles and goals set forth in the Act"). Given this standard of review, it is not surprising that every circuit court that has reviewed the matter has upheld the FLRA's view of whether disclosure is "necessary" for the collective bargaining process under § 7114(b)(4). *Department of the Navy v. FLRA,* 840 F.2d 1131, 1137–39 (3d Cir.1988); *Department of the Air Force v. FLRA,* 838 F.2d 229, 231–32 (7th Cir.1988); *Department of Agriculture v. FLRA,* 836 F.2d 1139, 1142 (8th Cir.1988), *vacated and remanded,* —— U.S. ——, 109 S.Ct. 831, 102 L.Ed.2d 964 (1989); *Department of Health and Human Services v. FLRA,* 833 F.2d 1129, 1131–34 (4th Cir. 1987); *AFGE v. FLRA,* 786 F.2d 554, 557 (2d Cir.1986). We agree.

■ The agencies first contend that § 7114(b)(4)(B) requires disclosure only of data relating directly to subjects of contract negotiation; it regards the employees' names and addresses as relating merely to "the union's relationship with bargaining unit employees." Brief for Government Agencies 21. The FLRA, on the other hand, views as sufficient a relationship to the "union's ongoing representational responsibilities." *NLRB,* 24 FLRA at 920. It found in *Farmers Home Administration* that disclosure would "enable the Union[s] to communicate effectively and efficiently, through direct mailings to individual employees." 23 FLRA at 796.

This analysis is not unreasonable. As the Fourth Circuit noted, "The Union's duties as the exclusive representative of agency employees do not begin and end abruptly with each round of negotiations but continue during the interim." *Department of Health and Human Services,* 833 F.2d at 1132. The statutory references to "discussion" and "understanding" of subjects within the scope of collective bargaining provide some support for the Authority's reading. If the information is used to discover employee concerns, clearly it can enhance the usefulness of collective bargaining.

In addition, the Authority's view corresponds to that of private sector labor relations law. In *Prudential Insurance Co. v. NLRB,* 412 F.2d 77, 83–85 (2d Cir.1969), the court found that union communications with members of the bargaining unit related to the union's representational obligations. But compare *id.* at 85–87 (Friendly, J., dissenting) (arguing that true union purpose was recruitment of new members, a goal he found inadequate to justify forced release of employee names and addresses). As we agree that the FLRA's expansive interpretation is reasonable, we will not disturb it.

■ Next the agencies argue that the names and addresses are not "necessary" for the purpose stated because alternate means are available for communication between unions and government employees— desk drops, bulletin boards, "direct distributions," meetings and direct personal contact. Brief for Government Agencies 23. In *Farmers Home Administration,* the FLRA noted two advantages of mailings to home addresses. First, "content, timing and frequency" of communications would be entirely within union discretion, thus excluding the possibility of agency interference. 23 FLRA at 796–97. Second, the communications would be received under circumstances where employees could give them extended attention "without regard to the time constraints inherent in their work environments [or] any restraint the employee may feel as a result of the presence of agency management." *Id.* at 797.

While there is no evidence in the record either that agency management has interfered with on-the-job communications, or that employees could not pocket materials received at work for leisurely study at home, we do not believe the Authority's finding that release is "necessary" is either arbitrary or capricious. Necessity is a mat-

ter of degree, and in many contexts courts have found a statutory requirement of necessity satisfied even when alternative means were feasible. See *NRDC v. Thomas,* 838 F.2d 1224, 1236–38 (D.C.Cir.1988) (citing cases); cf. *Board of Trustees of State University of New York v. Fox,* —— U.S. ——, ——, 109 S.Ct. 3028, 3031–33, 106 L.Ed.2d 388 (1989) (speech restriction may be no broader than "necessary" to achieve goal even though it is not least restrictive alternative). Where, as here, the Authority clearly regarded the burden of disclosure on the agency and on employees as quite modest, and was entitled to do so for purposes of the interpretation of the Federal Labor Management Relations Act (FOIA and Privacy Act matters are a different story, discussed below), modest advantages realized through at-home mailings are enough to sustain its judgment. Again, the Authority's view agrees with that of private sector labor law. *Prudential Insurance Co. v. NLRB,* 412 F.2d at 81–83; but see *id.* at 85–86 (Friendly, J., dissenting) (alternative means of communication were adequate though not ideal).

Because it believed that home mailings would facilitate union-employee communications in certain ways, the Authority adopted a presumption of necessity, which could be rebutted "where, for example, the evidence discloses that a union has acted in a manner which leads to the conclusion that the employees whose addresses would be disclosed would be in imminent danger if the union knew where they lived." *Farmers Home Administration,* 23 FLRA at 798. We assume that the Authority will be alert to any special instances where disclosure imposes such safety risks or other out-of-the-ordinary burdens. The Eighth Circuit on its own motion conditioned its affirmance of the Authority's disclosure order on the withholding of names and addresses of employees who so requested, observing that mailings by a union to those who did not wish to receive them would scarcely serve the public interest. *Depart-*

*ment of Agriculture,* 836 F.2d at 1143–44. In response to the FLRA's petition for certiorari, however, the Solicitor General rejected this position, saying that he found no basis for an "'individualized' veto" in the statute. See Brief for the Respondents 17–18, *FLRA v. Department of Agriculture,* —— U.S. ——, 109 S.Ct. 831, 102 L.Ed.2d 964 (1989). (The Supreme Court remanded the case for reconsideration in light of "routine use" notices filed by the relevant agencies.) But compare *Department of the Air Force v. FLRA,* 838 F.2d 229, 233 (7th Cir.1988) (suggesting desirability of individual check-off system, but not mandating it in light of absence of request). While we uphold the FLRA's rejection of a case-by-case approach as within its authority, we rest our conclusion on the assumption that it will be sensitive to legitimate claims that disclosure will impose undue burdens.[2]

## II. THE PRIVACY ACT

The statute on which the FLRA relies for its disclosure orders, 5 U.S.C. § 7114(b)(4), requires agencies to supply data only "to the extent not prohibited by law." The agencies contend that release of employee names and addresses would violate the Privacy Act, which prohibits the disclosure of personal information about federal employees without their consent. 5 U.S.C. § 552a(b) (1982). The FLRA does not dispute that the information is protected by the general language of the Privacy Act, but argues that the release falls within two explicit exceptions. First, § 552a(b)(2) allows disclosure that is "required under section 552 of this title [the Freedom of Information Act]." Second, § 552a(b)(3) allows disclosure "for a routine use." Under the latter provision, disclosure is proper only if it is in accordance with a routine use notice, published in the Federal Register by the relevant agency and describing "the categories of users and the purpose of such use." See 5 U.S.C. § 552a(e)(4)(D).

**2.** Despite our finding below that the proposed releases do not fall within the "routine uses" exception to the Privacy Act on the facts presented here, that exception may well be available in other cases. Cf. *FLRA v. Department of Agriculture,* —— U.S. ——, 109 S.Ct. 831, 102 L.Ed.2d 964 (1989) (remand for reconsideration in light of new "routine use" notices).

As the FLRA is not charged with a special duty to interpret either the Privacy Act or the FOIA, we do not defer to its interpretations of those statutes but review them de novo. *Illinois National Guard v. FLRA*, 854 F.2d 1396, 1400 (D.C.Cir.1988); *Department of the Treasury v. FLRA*, 837 F.2d 1163, 1167 (D.C.Cir.1988); *Professional Airways Systems Specialists v. FLRA*, 809 F.2d 855, 857 n. 6 (D.C.Cir.1987). We do not believe that the FLRA's reliance on the FOIA exception to the Privacy Act can survive the recent Supreme Court decision in *Department of Justice v. Reporters Committee for Freedom of the Press*, —— U.S. ——, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989).[3] Nor are we persuaded that disclosure of employees' names and home addresses to union representatives is authorized by the only routine use notice relevant here, one published by the Office of Personnel Management. OPM has interpreted the routine use to require a rigorous showing of the need for direct mailings in light of the available alternate methods of communication, and we owe great deference to its interpretation of its own regulations.

## A. The Freedom of Information Act Exception

■ While the Privacy Act generally prohibits disclosure of personnel information, it excepts disclosures "required under" FOIA. 5 U.S.C. § 552a(b)(2). FOIA in turn generally requires disclosure, but exempts information in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Application of exemption 6 requires a balancing of the harm to the individual whose privacy is breached against the public interest served by disclosure. See *Department of the Air Force v. Rose*, 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976).

The FLRA rejected the agencies' invocation of exemption 6, stating that "[o]n balance, ... the public interest to be furthered by providing the Union with an efficient method to communicate with unit employees it must represent far outweighs the privacy interests of individual employees in their names and home addresses." *Farmers Home Administration*, 23 FLRA at 793. With one exception,[4] the circuit court decisions upholding disclosure have similarly considered the *special* public interest in advancing collective bargaining as an aspect of the disclosure value, and, indeed, as the clinching value. See *Department of Navy*, 840 F.2d at 1135–37; *Department of Agriculture*, 836 F.2d at 1142–44; *Department of Health and Human Services*, 833 F.2d at 1134–36; *AFGE*, 786 F.2d at 556–57.

In *Reporters Committee*, however, the Court made clear that under FOIA the disclosure interest must be measured in terms of its relation to FOIA's central purpose—"to ensure that the *Government*'s activities be opened to the sharp eye of public scrutiny." 109 S.Ct. at 1482 (emphasis in original); see also *id.*, 109 S.Ct. at 1481 ("democracy cannot function unless the people are permitted to know *what their government is up to*") (quoting *EPA v. Mink*, 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973) (emphasis in original)). However great might be the generalized public interest in FBI "rap" sheets (criminal records) of non-government officials, the Court found it irrelevant to the interest in government activities and thus to FOIA privacy balancing. Although the context in *Reporters Committee* was the special privacy exemption for law enforcement records, exemption 7(C), we see no reason why the *character* of the disclosure interest should be different under exemption 6. While exemption 6 precludes only "a *clearly* unwarranted invasion of personal privacy" (emphasis added), that differ-

---

**3.** The Court granted certiorari in *Reporters Committee* on April 18, 1988, —— U.S. ——, 108 S.Ct. 1467, 99 L.Ed.2d 697, after oral argument of this case. After the Court's decision issued on March 22, 1989, we ordered supplemental briefing.

**4.** The Seventh Circuit followed our own decision in *Reporters Committee* and treated the disclosure interest as a fixed quantity for all cases, regardless of the character of the particular information at stake. *Department of Air Force*, 838 F.2d at 232–33.

ence between it and exemption 7(C) goes only to the *weight* of the privacy interest needed to outweigh disclosure.

A recent Supreme Court decision might be thought to undermine our view of the restricted character of the disclosure interest for purposes of exemption 6. *United States Department of Justice v. Tax Analysts,* —— U.S. ——, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989), finds that Justice Department copies of district court tax decisions are encompassed by FOIA, although admittedly their release "adds nothing whatsoever to public knowledge of government [executive branch][5] operations," see *id.,* 109 S.Ct. at 2854 (Blackmun, J., dissenting). In *Tax Analysts,* however, the Court was not considering any FOIA exemption at all, but was defining statutory phrases such as "agency records." It chose to do so in rather neutral terms, independent of FOIA's overarching purpose. But the Court's privacy "weighing" under exemption 7(C) clearly presents a closer analogy for defining exemption 6 weighing than did the issue at stake in *Tax Analysts.*

Since *Reporters Committee,* we have balanced the disclosure interest in a list of the names and home addresses of retired or disabled federal employees against their privacy interests under exemption 6, and have found the latter predominant. *National Association of Retired Federal Employees v. Horner ("NARFE"),* 879 F.2d 873 (D.C.Cir.1989). Indeed, *NARFE* found the interest in disclosure to be absolute zero. *Id.* at 879. Again we find the balance tilts in favor of privacy.

In analysing the privacy interest in *NARFE,* we considered the nature and scope of the privacy invasions that would flow from disclosure, as inferred from "the characteristic(s) revealed by virtue of being on the particular list." *Id.* at 877. We noted that the list requested would by its nature also disclose that the persons listed were retired or disabled and receiving a monthly annuity check from the federal government. "Any business or fund-rais-

ing organization for which such individuals might be an attractive market could get from the Government, at nominal cost, a list of prime sales prospects to solicit." *Id.* at 876. Cheap access to such lists would expose the annuitants " 'to an unwanted barrage of mailings and personal solicitations,' " *id.* at 876, quoting *Minnis v. Department of Agriculture,* 737 F.2d 784, 787 (9th Cir.1984). While the financial security of federal annuitants may somewhat exceed that of current federal workers, we doubt that the difference is enough to justify more than a very modest discount of the individuals' privacy interest, which in *NARFE* we characterized as "significant." *Id.* at 879. We note that entrepreneurs have filed FOIA requests for specific names of classes of current government employees in order to aid them in business solicitation. See *Schwaner v. Department of the Air Force,* 698 F.Supp. 4 (D.D.C.1988), *appeal pending,* No. 88–5341 (D.C.Cir.) (request for names and duty stations of certain ranks of Bolling Air Force personnel for purposes of life insurance solicitation).

On the disclosure side of the balance, again we find *NARFE* only modestly distinguishable. To be sure, the names of current workers might provide leads for an investigative reporter seeking to ferret out what "government is up to." But the same may be said as to the retirees involved in *NARFE;* indeed, recent retirees might sometimes, because of their relative invulnerability to retaliation, be an especially rich source of revelations. Moreover, the zealous investigator has an alternative means of access to current workers that is unavailable as to retirees—face-to-face conversation attained simply by following other leads and roaming government hallways. Concededly, access through home address lists might on occasion offer the investigator an advantage: a potential witness reached at home might assess the risk of discovery by superiors as less than if reached at work, and accordingly be more candid. While this advantage raises the public interest in disclosure above the

---

**5.** FOIA applies to "agencies," 5 U.S.C. § 552, which are defined to exclude both Congress and

the courts of the United States. *Id.* at § 551(1).

"nothing" at which *NARFE* valued the disclosure interest in retirees' names and addresses, we do not find it enough to outweigh the workers' significant interest in privacy.

The remaining question is whether this balance should be adjusted in light of the FLRA's legitimate finding that the Federal Labor Management Relations Act establishes another public interest in disclosure, namely in disclosure to labor unions for collective bargaining purposes. The Act specifically identifies a public interest in public sector collective bargaining, see 5 U.S.C. § 7101(a); *NTEU v. FLRA*, 810 F.2d 295, 300 (D.C.Cir.1987) (Congress believed that collective bargaining in the federal sphere would contribute to effective running of public business), and the FLRA's determinations here rest on a provision of that Act that expressly calls for disclosure as a means to facilitate that interest, see 5 U.S.C. § 7114(b)(4). Other circuit courts have invoked these disclosure values in the Privacy Act–FOIA balancing, but they did so without explanation. *Reporters Committee* requires that this reliance on non-FOIA disclosure interests be either explained or abandoned.

*Reporters Committee* itself stated that "the identity of the requesting party has no bearing on the merits of his or her FOIA request," with the exception of the case where a privacy interest is based on a claim of privilege and the person protected by the privilege seeks the information for himself (giving as an example a FOIA request by the subject of a presentence report). 109 S.Ct. at 1480. But the statement does not necessarily mean that there is no exception to the general rule that the public interest in disclosure under FOIA should be defined exclusively in terms of finding out what the "government is up to." Nothing in the passage suggests that the Court had considered and rejected the relevance of public interest objectives identified by Congress in other disclosure statutes. Moreover, the argument here is not that the *identity* of the requester should alter the disclosure interest, but rather that a congressional (non-FOIA) disclosure mandate might do so.

On the other hand, the language of the Privacy Act itself is hard to square with such a broad view. Under 5 U.S.C. § 552a(b)(2), disclosure of a personal record, without the consent of the person to whom it pertains, is prohibited "unless disclosure of the record would be ... required under section 552 of this title [FOIA]." The reading proposed by the Authority would in effect construe this as encompassing disclosures required "under FOIA *or any agency decision based on a disclosure-related statute.*" Alternatively, with more nuance but considerably more complication, it might apply to disclosures "required where the disclosure value under FOIA, and under any congressionally authorized agency disclosure decision, in the aggregate outweigh the privacy interest." One can, indeed, imagine numerous variations in which to cast this gloss.

Privacy Act exception b(2) speaks only of FOIA. We do not believe we are entitled to engage in the sort of imaginative reconstruction that would be necessary to introduce collective bargaining values into the balancing process. Consistent with the holding in *NARFE*, we find that federal employees' have privacy interests in their names and home addresses that must be protected and that the relevant public interest in disclosure, though not nothing, is outweighed.

Thus we turn to the routine use exception of the Privacy Act, an independent ground potentially supporting the FLRA's holding that release of the employees' names and addresses is not prohibited by law.

## B. *The Routine Use Exception*

The "routine use" exception to the Privacy Act, 5 U.S.C. § 552a(b)(3), allows disclosure of personnel records

> for a routine use as [1] defined in subsection (a)(7) of this section [5 U.S.C. § 552a(a)(7)] and [2] described under subsection (e)(4)(D) of this section [5 U.S.C. § 552a(e)(4)(D)].

The effect of the first constraint is to confine routine use disclosures to ones that

are "compatible with the purpose for which [the information] was collected," 5 U.S.C. § 552a(a)(7); the agencies raise no issue on that score. Instead, they question whether the proposed disclosure complies with the requirement that the disclosure fall within the uses "described under" 5 U.S.C. § 552a(e)(4)(D). This provision requires an agency maintaining personnel records to describe in a Federal Register notice "each routine use of the records ..., including the categories of users and the purpose of such use." The agencies argue that OPM's routine use notice, the only one relied on by the Authority and unions, does not encompass disclosure for the present purposes.

The Office of Personnel Management maintains "Official Personnel Files" that contain federal employees' names and home addresses. These remain its responsibility even though they are located physically in the government agencies. *Farmers Home Administration*, 23 FLRA at 794. OPM's notice of the routine uses for information from an employee's Official Personnel File provides that the records may be used:

> j. To disclose information to officials of labor organizations recognized under 5 U.S.C. Chapter 71 when relevant and necessary to their duties of exclusive representation concerning personnel policies, practices, and matters affecting working conditions.

*Privacy Act of 1974: Publication of Notices of Systems of Records and Proposed New Routine Use*, 49 Fed.Reg. 36,949, 36,956 (Sept. 20, 1984). The FLRA found that the data sought here was covered by OPM's paragraph j. *Farmers Home Administration*, 23 FLRA at 794.

■ An agency's interpretation of its own regulations is normally controlling unless it is "plainly erroneous or inconsistent" with the language of the regulation. *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); see also *San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 30 (D.C.Cir. 1986) (agency interpretation of its own regulations given "controlling weight" by the courts). Broad deference makes especially good sense for these interpretations; as the agency has the authority to amend the regulation itself, a court's refusal to defer may simply postpone application of the agency's legitimate view. For purposes of determining the scope of OPM's routine use notice, then, an official OPM interpretation would be entitled to great deference.

Unfortunately, the record here is slightly obscure as to OPM's interpretation. The predecessor agency to OPM, the Civil Service Commission, issued guidelines to aid agencies in determining whether releases to labor unions were appropriate. *Disclosing Information Covered Under the Freedom of Information Act and the Privacy Act to Labor Organizations Recognized Under Executive Orders 11636 and 11491, As Amended*, Federal Personnel Manual, Supplement 711–1, Appendix C (Aug. 10, 1978). The guidelines did not indicate how the existence and adequacy of alternate means of communication should affect the necessity inquiry. In May 1986, the portion of the Manual containing those guidelines was deleted; the subsequent notice of the change indicated that Appendix D of the new chapter was reserved for "material concerning the disclosure of information to labor organizations." Federal Personnel Manual, Table of Changes, Basic Installment 334 (June 24, 1986). Although three years have elapsed since the deletion, OPM has not yet promulgated guidelines concerning disclosure of personnel data to unions. See Federal Personnel Manual, Supplement 711–1 (reserving Appendix D for future guidelines).

■ Nonetheless, on June 25, 1987 Constance Horner, then the Director of OPM, stated in a letter to Richard Willard, then Assistant Attorney General, that the "current official interpretation of the routine use is set forth in OPM's *Home Addresses Cases amicus* brief to the FLRA dated July 14, 1986 [Brief for Government Agencies, Addendum D], and will remain in effect pending formal revision and issuance of a new guideline." See Brief for Government Agencies, Addendum B. The cited *amicus* brief first provides OPM's interpretation of 5 U.S.C. § 7114(b)(4); it contends

that disclosure cannot be "necessary" within the meaning of § 7114(b)(4) if "adequate alternative means exist for contacting [the employees]." *Amicus* Brief at 9. The brief goes on to provide OPM's views as to the meaning of paragraph j of its routine use notice, adopting its previous analysis of § 7114(b)(4). Moreover, because paragraph j has a dual standard of necessity and relevance, the OPM believes that it is more restrictive than § 7114(b)(4). *Id.* at 20.

Before we decide whether *amicus* brief's interpretation is a reasonable one, we must decide whether we can properly treat it as OPM's official interpretation. Courts have sometimes declined to defer at all to agency counsel's litigative positions. See, e.g., *Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 567 F.2d 1174, 1177 n. 3 (2d Cir.1977) (holding that "an *amicus curiae* is no more a witness than any other advocate" and refusing to accept agency counsel's "current litigating position" as authoritative). This court has more cautiously noted that "[t]here is some question ... whether an interpretive theory put forth only by agency counsel in litigation, which explains agency action that could be explained on different theories, constitutes an 'agency position' for purposes of *Chevron* [*v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)]." *Church of Scientology of California v. IRS*, 792 F.2d 153, 162 n. 4 (D.C.Cir.1986) (en banc), *aff'd*, 484 U.S. 9, 108 S.Ct. 271, 98 L.Ed.2d 228 (1987).

But we think that the reasons for courts' scanting such interpretations are altogether absent here. We can identify two basic concerns for reluctance to defer to agency counsel's litigating position. First, the position may not reflect the views of the agency head(s). Judicial reliance on such a position might (in the statutory interpretation context) lock an agency into a view it never espoused. See *Women Involved in Farm Economics v. Department of Agriculture ("WIFE")*, 876 F.2d 994, 998–99 (D.C.Cir.1989). That risk may have been especially acute before *Chevron* made crystal clear that an agency interpreting a statute under an express or implied delegation of authority is free to modify its view.

Quite apart from the potential lock-in, an agency informed that its stated reason was inadequate might well reverse field; judicial affirmance on a basis never articulated by the agency could thus produce an unintended result and usurp the agency's function. See *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). In any event, no such concern exists here. Ms. Horner, the agency head, has explicitly adopted the view of the *amicus* brief. There is no risk that counsel may have acted as "mavericks disembodied from the agency that they represent." *Church of Scientology of California v. IRS*, 792 F.2d at 165 (Silberman, J., concurring).

Second, a position established only in litigation may have been developed hastily, or under special pressure, or without an adequate opportunity for presentation of conflicting views. Indeed, where statutes specify procedures for a specific type of decision, one engendered solely in litigation will (typically) have skirted those procedures. Cf. *WIFE*, 876 F.2d at 998–99 (stressing role of statutory obligations to explain actions). Here again we find nothing to justify such a concern. The way in which Director Horner adopted the brief as the official OPM statement seems in no respect to fall short of OPM's usual procedures for interpreting its routine use notice. Guidelines in the Federal Personnel Manual are drafted by OPM staff and approved by the Director, see Federal Personnel Manual, Chapter 711 at § 2–6(1) (June 24, 1986). This seems functionally indistinguishable from the legal staff's preparing the *amicus* brief and Director Horner's officially adopting it in her letter of June 25, 1987. Thus we have no reason to believe that the interpretive process here was any less thorough, less formal or less open than it would normally be. Nor, of course, did the position represent any kind of agency switch. Compare Judge Silberman's concurring opinion in *Church of Scientology*, suggesting that acceptance of an agency counsel articulation of a statutory interpretation is appropriate unless it is inconsistent with a prior administration construction, or there is "no link"

between the interpretation and administrative practice, or it is "no more than a 'current litigating position.'" 792 F.2d at 165 (citations omitted). Thus we believe it entirely appropriate to treat Mr. Horner's adoption of the *amicus* brief as an authoritative expression of the agency's views.

We note that this court recently held in *WIFE* that where an agency developed a regulation under an exemption from 5 U.S.C. § 553's requirement of a statement of the rule's "basis and purpose," counsel's explanation of the rule's underlying theory was acceptable—i.e., did not trigger the *Chenery* requirement that action unsupported by a valid *agency* explanation must be remanded for reconsideration. 876 F.2d at 997–1000. Though the case generally supports the view taken here, it is not identical. There the agency *position* had been taken long before counsel's explanation, so the court's ultimate deference in the case was to a pre-litigation stance. On the other hand, in *WIFE*, the sole source of any agency *explanation* of its position was that of counsel in litigation, whereas here counsel and agency head are formally on record expressing the same position and explanation.

■ Turning to OPM's interpretation of "necessity," we find it quite reasonable. To the extent that alternate means adequately allow the unions to communicate with federal employees, it is reasonable to conclude that it is not "necessary" for the unions to be able to send mail to employees' homes. See *Prudential Insurance Co.*, 412 F.2d at 85–87 (Friendly, J., dissenting) (in view of alternate methods of communication, release of names and home addresses was not a "necessity for union organization and representation"). Although it may seem anomalous that the FLRA and OPM interpret such similar language differently (especially as both § 7114(b)(4) and paragraph j evolved from language developed by the Authority's institutional predecessor, the Federal Labor Relations Council), we cannot require conformity as long as both interpretations are reasonable.

Thus paragraph j of OPM's routine use notice, as explained by the *amicus* brief, does not authorize the release of employees' names and home addresses to unions without some showing that the alternate means of communication are insufficient. In the absence of any such showing here, we set aside the FLRA's determinations that the routine use exception of the Privacy Act applies.

\*     \*     \*

■ At oral argument and in supplemental briefing, the union in the case concerning the Social Security Administration argued that the agency was collaterally estopped from defending itself on the merits before this court because of the Second Circuit's decision in *AFGE v. FLRA*, 786 F.2d 554 (2d Cir.1986). We find collateral estoppel inappropriate here because there has been "a change or development in the controlling legal principles," namely the Supreme's Court's decision in *Reporters Committee*, that has rendered the first determination "obsolete or erroneous, at least for future purposes." *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 599, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948); see also *Graphic Communications International Union v. Salem–Gravure Division of World Color Press, Inc.*, 843 F.2d 1490, 1493 (D.C.Cir.1988) ("issue preclusion does not apply when there has been an intervening change in legal principles").

\*     \*     \*

We defer to the FLRA's view that disclosure of employees' name and home addresses are "necessary" for purposes of collective bargaining under § 7114(b)(4) of the Federal Labor Management Relations Act. Nevertheless, we must set aside its decisions because release of that information would violate the Privacy Act. We find that neither the Act's exception for disclosure required by FOIA nor its exception for disclosure pursuant to a routine use notice is applicable in these cases. We deny the Authority's applications for enforcement and grant the government agencies' petitions for review.

*So ordered.*

RUTH BADER GINSBURG, Circuit Judge, concurring:

In common with our sister circuits, I believe it unlikely that Congress intended to deny to unions serving employees in the public sector lists of names and addresses of bargaining unit workers of a kind routinely supplied, under prevailing law, to unions serving employees in the private sector. However, the logic of the court's opinion is irreproachable. The broad cross-reference in 5 U.S.C. § 7114(b)(4)—"to the extent not prohibited by law"—picks up the Privacy Act unmodified; that Act, in turn, shelters personal records absent the consent of the person to whom the record pertains, unless disclosure would be required under the Freedom of Information Act (FOIA).

Once placed wholly within the FOIA's domain, the union requesting information relevant to collective bargaining stands in no better position than members of the general public. True, unions have a special interest in identifying and communicating with persons in the bargaining unit, an interest initially accommodated by 5 U.S.C. § 7114(b)(4). The bargaining process facilitation interest is ultimately unavailing, however, because it "falls outside the ambit of the public interest that the FOIA was enacted to serve," *i.e.*, the interest in advancing "public understanding of the operation or activities of the government." *United States Dep't of Justice v. Reporters Committee for Freedom of the Press*, — U.S. —, 109 S.Ct. 1468, 1482–83, 103 L.Ed.2d 774 (1989).

The disadvantage at which unions operating in the public sector are placed in comparison to unions in the private sector, if the former lack access to the lists sought here, suggests the need for a second look. Had the Supreme Court envisioned this case, would it have qualified *Reporters Committee's* statement of the public interest relevant under the FOIA? Informed of the consequences of the Federal Labor Relations Statute's broad cross reference, would Congress opt to provide bargaining representatives in the public sector with the names and addresses of unit employees? These are questions now ripe for consideration by the appropriate lawmaking or precedent-setting authorities.

Every circuit that considered the bargaining unit name and address list issue prior to *Reporters Committee* reached a result in conflict with the disposition we announce today.[1] Those circuits were mindful of the congressional recognition that "labor organizations and collective bargaining in the civil service are in the public interest," 5 U.S.C. § 7101(a) (1982); they sought to avoid discrepancies in the treatment of public and private sector unions dissonant with federal labor relations policy. Noteworthy too, the ruling that *Reporters Committee* impels this court to make appears an anomaly when compared with *United States Dep't of Justice v. Tax Analysts*, — U.S. —, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989), the Supreme Court's most recent pronouncement on the FOIA. Most significantly, as our sister circuits' analyses indicate, there is at stake here no more than a modest privacy interest, one outbalanced by a broader view of the public interest than *Reporters Committee* permits.

## I.

Private sector employers are required under current law to provide unions with bargaining unit employees' names and addresses. *See NLRB v. Associated Gen'l Contractors*, 633 F.2d 766, 773 (9th Cir. 1980) (disclosure required under 29 U.S.C. § 158(a)(5)'s duty to bargain in good faith); *NLRB v. Pearl Bookbinding Co.*, 517 F.2d 1108, 1113 (1st Cir.1975) (same); *United Aircraft Corp. v. NLRB*, 434 F.2d 1198, 1204 (2d Cir.1970) (same), *cert. denied*, 401

**1.** *See United States Dep't of the Navy v. FLRA*, 840 F.2d 1131 (3d Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988); *United States Dep't of the Air Force v. FLRA*, 838 F.2d 229 (7th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988); *United*

*States Dep't of Agriculture v. FLRA*, 836 F.2d 1139 (8th Cir.1988), *vacated and remanded*, — U.S. —, 109 S.Ct. 831, 102 L.Ed.2d 964 (1989); *United States Dep't of Health & Human Servs. v. FLRA*, 833 F.2d 1129 (4th Cir.1987); *AFGE, Local 1760 v. FLRA*, 786 F.2d 554 (2d Cir.1986).

U.S. 993, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971); *Prudential Ins. Co. of Am. v. NLRB,* 412 F.2d 77 (2d Cir.) (same), *cert. denied,* 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969); *Standard Oil Co. v. NLRB,* 399 F.2d 639, 640 (9th Cir.1968) (same); *cf. NLRB v. Wyman–Gordon,* 394 U.S. 759, 767, 89 S.Ct. 1426, 1430, 22 L.Ed.2d 709 (1969) (employer must provide candidate unions with names and addresses prior to election of bargaining representative). *But see Prudential,* 412 F.2d at 85–86 (Friendly, C.J., dissenting) (because alternative means of communication are adequate though not ideal, 29 U.S.C. § 158(a)(5) does not require disclosure); *cf. Shell Oil Co. v. NLRB,* 457 F.2d 615 (9th Cir.1972) (disclosure not required where there was prior harassment of nonstriking workers and employer offered to give list to independent mailing agency for use in union mailings).

Private sector labor-relations case law, although not strictly binding as precedent, generally provides strong guidance in parallel public sector matters. *See NTEU v. FLRA,* 810 F.2d 295, 299–300 (D.C.Cir. 1987); *Library of Congress v. FLRA,* 699 F.2d 1280, 1286–87 (D.C.Cir.1983); *see also United States Dep't of the Navy v. FLRA,* 840 F.2d 1131, 1138 (3d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988); *United States Dep't of Health & Human Servs. v. FLRA,* 833 F.2d 1129, 1132 (4th Cir.1987). This is so because Congress modeled the Federal Labor Relations Statute (FLRS) on the Labor Management Relations Act (LMRA);[2] in the drafting process, the legislators paid close attention to judicial decisions in private sector labor law cases. *See NTEU,* 810 F.2d at 299. The two statutes present similar definitions of collective bargaining and serve similar purposes. *See United States Dep't of Health & Human Servs.,* 833 F.2d at 1132. Tellingly, the opening section of the FLRS states: "[E]xperience *in both private and public sector employment* indicates that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing ... *safeguards the public interest.*" 5 U.S.C. § 7101(a)(1) (1982) (emphasis added). No policy concern Congress identified warrants different treatment of unions in the private and public sectors for the purpose at hand. *See United States Dep't of Health & Human Servs.,* 833 F.2d at 1132.

It bears emphasis that Congress has explicitly directed each public sector union to "represent[ ] the interests of all employees in the [bargaining] unit it represents without discrimination and without regard to labor organization membership." 5 U.S.C. § 7114(a)(1) (1982). Effective communication on workplace and work-related issues—for example, impending workforce reductions and available labor protections—is surely facilitated by home mailings. Other means of union-worker communication—such as worksite visits, meetings, and newsletter distributions at the workplace—do not afford the same comprehensive coverage. Again, as other circuits have said,[3] the public interest in the bargaining representative's ready access to unit employees appears no less vital in federal employment than in private employment. It thus seems to me nearly certain that Congress did not anticipate the outcome *Reporters Committee* requires us to reach in this case.

II.

Set against the outcome in *Tax Analysts,* the Supreme Court's most recent interpretation of the FOIA, the holding that the Information Act blocks public sector unions from access to federal employees' names and addresses becomes all the more anoma-

---

2. "In passing the [FLRS]," the Supreme Court observed, "Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest...." *Bureau of Alcohol, Tobacco & Firearms v. FLRA,* 464 U.S. 89, 107, 104 S.Ct. 439, 449, 78 L.Ed.2d 195 (1983).

3. *See United States Dep't of the Navy,* 840 F.2d at 1136–37; *United States Dep't of the Air Force,* 838 F.2d at 233; *United States Dep't of Agriculture,* 836 F.2d at 1142; *United States Dep't of Health & Human Servs.,* 833 F.2d at 1132; *AFGE, Local 1760,* 786 F.2d at 557.

lous. *Tax Analysts* held that the FOIA requires the Department of Justice to release its compilations of district court tax decisions to the publishers of *Tax Notes*, a weekly magazine. *See* 109 S.Ct. at 2853. Justice Blackmun centered his dissent on the point that release of the requested court orders and opinions "adds nothing whatsoever to public knowledge of government operations." *See id.* at 2854 (Blackmun, J., dissenting).

As the court's opinion in the instant case correctly points out, no privacy exemption militated against disclosure in *Tax Analysts. See* Ct. Op. at 1451.[4] Nonetheless, the juxtaposition of *Tax Analysts* and our decision today reveals a tension in the Supreme Court's interpretation of the FOIA: the Information Act, in the first instance, demands no showing at all of "public interest"; yet, once a privacy interest, however modest, is implicated, the Act forbids disclosure of information that advances a significant public interest (here, the interest in informed collective bargaining), if that interest is unrelated to FOIA's "core purpose." *See Reporters Committee*, 109 S.Ct. at 1483. It is not plausible that Congress intended the FOIA to reduce the cost of publishing enterprises like *Tax Notes*, but to disarm bargaining representatives operating in the public sector.

### III.

Perhaps the most persuasive indication that neither Congress nor the Supreme Court anticipated the outcome in this case is that the balance between the public interest in disclosure and the individual interests in privacy, when viewed unfiltered by the lens of *Reporters Committee*, overwhelmingly favors disclosure. First, the privacy interests threatened by release of the names and addresses of bargaining unit employees, while not insignificant, are far less compelling than those in *Reporters Committee* and in other cases where disclo-

sure has been disallowed. Most circuits have concluded that privacy interests in names and addresses alone are "not particularly compelling." *AFGE, Local 1760 v. FLRA*, 786 F.2d 554, 556 (2d Cir.1986); *see also NARFE v. Horner*, 879 F.2d 873, 879 (D.C.Cir.1989) ("modest" but enough to prevent disclosure absent any cognizable public interest); *United States Dep't of the Navy*, 840 F.2d at 1137 (3d Cir.) ("minimal"); *United States Dep't of the Air Force v. FLRA*, 838 F.2d 229, 232 (7th Cir.1988) ("minuscule"), *cert. denied*, —— U.S. ——, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988); *United States Dep't of Agriculture v. FLRA*, 836 F.2d 1139, 1143 (8th Cir.1988) (agreeing that "average employee's privacy interest in his home address is not particularly compelling," but observing that "not all employees are average," and therefore ordering disclosure of names and addresses unless employee requests that information be kept confidential), *vacated and remanded*, —— U.S. ——, 109 S.Ct. 831, 102 L.Ed.2d 964 (1989); *Kurzon v. Department of Health & Human Servs.*, 649 F.2d 65, 69 (1st Cir.1981) (intrusion so "limited" that exemption 6 balancing not even triggered); *Ditlow v. Schultz*, 517 F.2d 166, 170 (D.C.Cir.1975) ("less than a substantial invasion of privacy"). *But compare AFGE Local 1923 v. United States Dep't of Health & Human Servs.*, 712 F.2d 931, 932 (4th Cir.1983) ("strong privacy interest") *with United States Dep't of Health & Human Servs. v. FLRA*, 833 F.2d 1129, 1135 n. 8 (4th Cir.1987) (noting that issue whether employees have "a strong privacy interest" in their home addresses is a "close one" and citing dissent of Winter, C.J., in *AFGE Local 1923*, 712 F.2d at 934 (maintaining that "there is little privacy in one's name and home address")).

In all but one of the circuit decisions that have found privacy interests in names and addresses sufficient to bar disclosure, the requested data would have conveyed further information of a more revealing and

---

**4.** As the court's opinion explains, the ruling in *Tax Analysts*—that the FOIA calls for disclosure of records that do not advance public knowledge of "what government is up to"—does not

reach back to modify *Reporters Committee's* restriction on the public interest cognizable in privacy exemption balancing.

commercially valuable character.[5] *See NARFE*, at 876 (list indicated that individuals were retired or disabled and received an annuity); *Aronson v. United States Dep't of Housing & Urban Dev't*, 822 F.2d 182, 186 (1st Cir.1987) (list revealed that individuals owed substantial sums); *Minnis v. United States Dep't of Agriculture*, 737 F.2d 784, 787 (9th Cir.) (list revealed individuals' interests in water sports and the out-of-doors), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *Heights Community Congress v. Veterans Administration*, 732 F.2d 526, 528 (6th Cir.) (requester sought listing of loan amounts), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 506, 83 L.Ed.2d 398 (1984); *Committee on Masonic Homes of R.W. Grand Lodge v. NLRB*, 556 F.2d 214, 220 (3d Cir.1977) (information indicated union preference and contained thumbnail sketch of job classification and status); *Wine Hobby USA, Inc. v. IRS*, 502 F.2d 133, 137 (3d Cir.1974) (list revealed family status and interest in wine-making). Here the list would reveal nothing more than the name, address, and bargaining unit of each individual. The list would lump together employees of a variety of grade and pay levels and disclose no additional, personal information that might be embarrassing or enhance the value of the list for solicitation purposes.

The privacy invasion threatened by release of the bare names and addresses in this case pales in comparison to the privacy invasion threatened by release of the rap sheet in *Reporters Committee*. An individual's mailing address, unlike the scattered bits of information relevant to criminal matters compiled in a rap sheet, has no pejorative connotations. The local phone book prints names and addresses for most permanent residents of a community. In contrast, the rap sheet at issue in *Reporters Committee* contained a collection of information not "freely available," information "hard-to-obtain," indeed impossible to amass without "diligent search of courthouse files, county archives, and local police stations throughout the country." *See Reporters Committee*, 109 S.Ct. at 1477.

Furthermore, the Supreme Court emphasized in *Reporters Committee* "the web of federal statutory and regulatory provisions that limit the disclosure of rap-sheet information." *Id.* Again in conspicuous contrast, 5 U.S.C. § 7114(b)(4) indicates Congress' understanding that employees have a reduced expectation of privacy regarding information that facilitates collective bargaining. In fact, unions have obtained far more personal information under section 7114(b)(4) than the names and addresses at issue here. Examples include performance appraisals and disciplinary records. *See, e.g., AFGE v. FLRA*, 793 F.2d 1360 (D.C. Cir.1986) (disciplinary records); *Internal Revenue Service and NTEU*, 25 F.L.R.A. (No. 13) 181 (1987) (performance appraisal). Indeed, one of the unions in the cases consolidated in this review proceeding has already obtained employee salary information. *See* Joint Appendix at 116.

Finally, in comparing the lesser privacy invasion involved in this case to the large one at stake in *Reporters Committee*, one might note that this case presents a question under exemption 6 rather than exemption 7(C). The Supreme Court observed in *Reporters Committee* that exemption 6 differs from exemption 7(C) in two key ways. First, to fall within exemption 6, the invasion of privacy must be "clearly" unwarranted; the adverb "clearly" is omitted from exemption 7(C). Second, exemption 6 prohibits only disclosures that "would constitute" an invasion of privacy while exemption 7(C) encompasses any disclosure that "could reasonably be expected to constitute" such an invasion. *See Reporters Committee*, 109 S.Ct. at 1472–73.[6]

---

**5.** The one exception was *AFGE Local 1923 v. United States Dep't of Health & Human Servs.*, 712 F.2d 931 (4th Cir.1983). In *United States Dep't of Health & Human Servs. v. FLRA*, 833 F.2d 1129 (4th Cir.1987), the same circuit distinguished *AFGE Local 1923* as arising under the FOIA alone rather than under the FOIA through

5 U.S.C. § 7114(b) and cited the dissent of Winter, C.J., in *AFGE Local 1923* with approval. *See* 833 F.2d at 1135 n. 8.

**6.** *See NARFE v. Horner*, 879 F.2d 873, 878 (D.C. Cir.1989) (describing as exemption 6 threshold, proof of "a substantial probability," *i.e.*, "little

As the court's opinion in this case states, these textual differences concern only the privacy side of the balance; they do not justify our consideration of a broader range of public interests under exemption 6. *See* Ct. Op. at 1451. However, they do make the point that the privacy claim before us is of a relatively lower value in the FOIA's calculus.

Turning to the public interest side of the balance, the force of the FLRA's position, as affirmed by circuit court precedent until now uniform, is evident. *See supra* pp. 1457–58. To recapitulate, it seems to me ironic that the FLRS, a measure unquestionably designed to arm federal unions with capacity closer to that of unions in the private sector, must be interpreted to diminish the access of federal employees' unions to workers in the bargaining unit.

### CONCLUSION

For the reasons stated, and with the suggestion that this issue merits consideration by decisionmakers equipped to clarify section 7114(b)(4) or to qualify *Reporters Committee*, I reluctantly concur in the court's opinion and judgment.

SENTELLE, Circuit Judge, concurring:

I completely concur in the Court's conclusion in this case and find the Court's reasoning to be wholly sound on all points concerning the question addressed in Part II of the opinion. I write separately only to express certain misgivings as to Part I.

I question whether the FLRA interpretation of 5 U.S.C. § 7114(b)(4) (1982) is one to which we should defer. The FLRA interpretation upholds the Unions' view that the names and home addresses of agency employees are included within the statutory mandate requiring agencies

> to furnish to the exclusive representative involved, or its authorized representative, upon request and, to the extent not prohibited by law, data ... which is reasonably available and necessary for full and proper discussion, understanding, and ne-

reason to doubt," "that disclosure will cause an

gotiation of subjects within the scope of collective bargaining....

*Id.* § 7114(b)(4)(B).

The statute does not require the agencies to provide the exclusive representative with all information useful to its union activities, but only data that are "reasonably available and *necessary for full and proper discussion, understanding, and negotiation within the scope of collective bargaining." Id.* (emphasis added). The FLRA's discretion to define the terms within section 7114(b)(4) is far from unbridled. "Collective bargaining" is defined by Congress as

> the performance of the mutual obligation of the representative of an agency and the exclusive representative of employees ... to meet at reasonable times and to consult and bargain in a good-faith effort to reach agreement with respect to the conditions of employment affecting such employees and to execute, if requested by either party, a written document incorporating any collective bargaining agreement reached, but the obligation referred to in this paragraph does not compel either party to agree to a proposal or to make a concession....

5 U.S.C. § 7103(a)(12) (1982). The Authority's construction of the agencies' obligations under section 7114(b)(4) appears to be outside the confines of the discretion left to the Authority after the erection of the statutory definitional wall. The names and home addresses of employees are no doubt useful to the Unions in their other representational activities and in recruitment. (*Cf. Prudential Ins. Co. v. NLRB,* 412 F.2d 77, 86 (2d Cir.1969) (Friendly, J., dissenting) (arguing that recruitment is the true goal of private sector unions seeking employee names and addresses). However, section 7114(b)(4) only mandates the furnishing of data necessary to the collective bargaining purpose as defined in section 7103(a)(12). There is no such mandate for data necessary to the Unions' other concededly useful and even commendable purposes. The deference to agency construction mandated in *Chevron USA, Inc. v.*

interference with personal privacy").

*Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), rests on the underpinning that Congress, by leaving a gap for the agency to fill, has made a "delegation of authority to the agency to elucidate a specific provision of the statute by regulation," *id.* at 843–44. Because Congress, in the legislation under review, itself walled-in the gap and excluded to an extent the FLRA from its present construction of the statute, the FLRA's construction approaches the limits of the zone in which we owe it *Chevron* deference.

As the Court's opinion recites, however, the weight of authority heavily supports the road taken by the Court in upholding the FLRA's decision, and I join, if somewhat reluctantly, my colleague's opinion on this point. I reiterate that I find the Court's reasoning in Part II to be sound and convincing, and its conclusion wholly correct.